IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RAYMOND JACKSON and<br>MAURGREITA JANE JACKSON, individually<br>and on behalf of NICOLAS JAMES ALLEN<br>JACKSON, a minor, and JACOB LOUIS<br>DONALD JACKSON, a minor;<br>MAURGREITA JANE JACKSON, in her capacity<br>as trustee of THE BRENDA G. DUFF<br>IRREVOCABLE TRUST, THE JANE JACKSON<br>PB TRUST, THE JANE JACKSON TRUST and<br>THE JAMES DUFF PB TRUST and<br>JAMES DUFF, individually and on behalf of<br>LUCK MARIA DUFF, a minor, and<br>RACHEL PAULINA DUFF, a minor,<br><br>        Plaintiffs,<br><br>v.<br><br>REGIONS BANK,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO.  3:09-00908<br>JUDGE HAYNES |

**M E M O R A N D U M**

Plaintiffs: Raymond Jackson, Maurgreita Jane Jackson, individually and on behalf of Nicholas James Allen Jackson, a minor, and Jacob Louis Donald Jackson, a minor; Maurgreita Jane Jackson in her capacity as trustee of the Brenda G. Duff Irrevocable Trust, the Jane Jackson PB Trust, the Jane Jackson Trust and the James Duff PB Trust and James Duff individually and on behalf of Lucy Maria Duff, a minor, and Rachel Paulina Duff, a minor, filed this action under 28 U.S.C. § 1332, the federal diversity statute, against the Defendant Regions Bank, an Alabama corporation with its principal place of business in Birmingham, Alabama.  Plaintiffs assert state common law claims for negligence, unjust enrichment, negligent and fraudulent misrepresentation as well as violations of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §

47-18-101 et seq., arising out of the Defendant's agents' alleged acts and omissions in allowing Michael Park and Park Capital, Inc., Regions account holders, to embezzle and steal funds that Plaintiffs deposited at Regions Bank and its predecessor banks in Middle Tennessee.

Before the Court is the Defendant's motion to dismiss Plaintiffs' amended complaint (Docket Entry No. 10), contending, in sum, that the Defendant did not owe a duty to Plaintiffs and Plaintiffs' amended complaint otherwise fails to state viable claims. In response, Plaintiffs assert that Defendant's violation of state statutes governing banks and its willful omissions on the Parks' accounts are sufficient to state their claims under Tennessee law.

### A. Analysis of the Complaint

Given the extensive challenges to the legal sufficiency of Plaintiffs' multiple claims, the Court sets forth the material factual allegations in their amended complaint for the Plaintiffs' state law claims:

> 7. Each of the plaintiffs in this case engaged Michael Park and his company, Park Capital Management Group ("Park Capital"), to provide various services for the plaintiffs' investment asserts. Mr. Park and Park Capital were engaged, among other things, to provide plaintiffs with securities and other investments, to facilitate their investments, and to provide administrative services with respect to those investments. In the course of that business relationship, the plaintiffs advanced founds to Mr. Park and Park Capital, which Mr. Park and Park Capital were supposed to use to purchase investments on plaintiffs' behalf.
>
> 8. Unknown to plaintiffs at the time they engaged Mr. Park and Park Capital, and on all occasions when plaintiffs entrusted funds to Mr. Park and his company, Mr. Park was carrying on a criminal enterprise, and he did not intend to invest plaintiffs' assets appropriately, but, rather, intended to misappropriate plaintiffs' funds and/or use them in an unauthorized and unlawful manner.
>
> 9. In the summer of 2008, plaintiffs learned that Mr. Park had stolen all of the money that plaintiffs transferred to him. Throughout some or all of the time that plaintiffs utilized his services, and unknown to plaintiffs, Mr. Park stole and utilized plaintiffs' assets for his own purposes.

2

10.     Mr. Park is now in bankruptcy. He was indicted by a federal grand jury, pleaded guilty to criminal charges, and is awaiting sentencing.

11.     After Mr. Park's criminal enterprise was discovered, neither he nor Park Capital could return any of the funds invested by plaintiffs. It is reasonably possible that plaintiffs will recoup a small portion of their investments from the assets in Mr. Park's bankruptcy.

12.     As of the filing of bankruptcy by Mr. Park, the plaintiffs had advanced funds and entrusted to Mr. Park and Park Capital a total of $3,173,145.38. Those funds consisted of the following:

> (a)     From investments made on five occasions in 2005 and 2006, Skip Jackson and Janie Jackson, individually, had a total amount invested of $530,500 in a jointly owned account.
>
> (b)     From an investment made in 2005, Janie Jackson, acting in her capacity as trustee of The Jane Jackson PB Trust, had a total amount invested of $275,000.
>
> (c)     From investments made on three occasions in 2003 and 2005, Janie Jackson had a total amount invested of $69,665.18 on behalf of her minor son, Jacob Jackson.
>
> (d)     From investments made on three occasions in 2003 and 2005, Janie Jackson had a total amount invested of $69,665.18 on behalf of her minor son, Nicolas Jackson.
>
> (e)     From investments made on two occasions in 2004, Janie Jackson, acting in her capacity as trustee of The Brenda G. Duff Irrevocable Trust, had a total amount invested of $74,000.
>
> (f)     From investments made on two occasions in 2003 and 2005, Janie Jackson, individually, had a total amount invested of $55,000 in an account for which she was sole owner.
>
> (g)     From an investment made on a single occasion in 2007 by James Durf, in his capacity as trustee of the James Duff PB Trust, Janie Jackson who became trustee of that trust in May 2009, had a total amount invested of $1,304,662.30 in her capacity as trustee of the James Duff PB Trust.
>
> (h)     From investments made on three occasions in 2008, James Duff,

3

individually, had a total amount invested of $509,757.74.

(I) From investments made on two occasions in 2007, James Duff had a total amount invested of $112,789.61 on behalf of his minor daughter, Lucy Marie Duff.

(j) From an investment made on a single occasion in 2007, James Duff had a total amount invested of $51,767.67 on behalf of his minor daughter, Rachel Paulina Duff.

\*     \*     \*

14. Mr. Park and Park Capital opened and maintained several bank accounts at Regions Bank into which the investment funds of plaintiffs and other victims of Mr. Park's fraud were deposited.

15. Banks and broker-dealers in securities are subject to the Bank Secrecy Act, certain provisions of the USA PATRIOT Act, and the U.S. criminal statutes applicable to money laundering. Implementing regulations of the Bank Secrecy Act are promulgated and enforced by the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") often in collaboration with the Federal Functional Regulators. These regulations impose a range of anti-money laundering compliance requirements on the regulated institutions in the United States. Supervision and enforcement for these compliance efforts are undertaken by FinCEN and the functional regulators.

16. Banks and broker-dealers in securities are required to have implemented Customer Information Programs to adequately obtain and verify the identity of persons or entities that are opening accounts with them or establishing other on-going business relationships. Banks and broker-dealers in securities must design their programs to customer. Also, the bank or broker-dealer in securities must establish policies and procedures for Customer Due Diligence ("CDD") and Enhanced Due Diligence ("EDD") that is commensurate for the level of money laundering risk or terrorist financing risk posed by a particular customer or category of customers.

17. Banks and broker-dealers are required to implement policies and procedures to meet the record keeping requirements of the Bank Secrecy Act (e.g., the reporting of large currency transactions into or out of an account or the purchase o monetary instrument for $3,000 or more). In addition to recording the information, these financial institutions must retain this documentation for a period of five years, and must determine,

4

based on their risks posed by their customer base and the services provided, what type of ongoing monitoring should be implemented in order to detect and report unusual or suspicious activity.

* * *

23. In October 2004, the U.S. Financial Crimes Enforcement Network ("FinCen") and various other federal authorities filed cases and desist orders, monetary penalty assessments, a criminal Information, and a deferred criminal prosecution agreements against Regions/AmSouth. In these papers, the federal authorities concluded that during 2000-2004, Regions/AmSouth had violated the civil and criminal laws of the United States in a number of respects, including:

    • Knowingly and willfully violating the anti-money laundering program and suspicious activity reporting requirements of the Bank Secrecy Act.

    • Failing to report suspicious activities in a timely and accurate matter as a result of systemic deficiencies in the bank.

    • Failing to develop an anti-money laundering program reasonably designed to prevent Regions/AmSouth from being used to launder money.

    • Failing to implement sufficient policies and procedures across the bank to provide for the capture of suspicious activity information.

    • Failing to provide adequate board and management oversight and adequate training to ensure compliance with anti-money laundering program and suspicious activity reporting requirements.

    • Failing to assess the bank's risks and vulnerabilities to money laundering.

    • Failing in a number of instances to note and respond to circumstances in which the bank's accounts were being used to further Ponzi schemes, embezzlement, and other fraudulent misconduct.

* * *

25. Unfortunately, during the times relevant to the allegations in this complaint,

5

Regions/AmSouth failed to remedy its failure to comply with the federal laws addressed above. Having been put on notice by FinCen's actions that its business practices were not reasonably sufficient to prevent Ponzi schemes, embezzlement, and other fraudulent acts by its customers, Regions/AmSouth continued to do business without correcting those deficiencies.

26. Regions/AmSouth knew from the outset of its relationship with Mr. Park and Park Capital that as part of their business, Mr. Park and Park Capital received funds from investors to be held as the property of those investors and distributed in furtherance of their investment purposes and objectives.

* * *

28. Regions/AmSouth opened multiple accounts for Mr. Park and/or Park Capital, and funds belonging to plaintiffs and other investors were deposited into those accounts. Regions/AmSouth knew that the funds deposited in such accounts came from plaintiffs and/or other customers of Mr. Park and Park Capital, and that the funds did not belong to Mr. Park or Park Capital, but were held in trust to be used solely for the benefit of the investors who were customers of Mr. Park and Park Capital, including plaintiffs.

29. The transactions in the accounts of Mr. Park and Park Capital at Regions/AmSouth triggered numerous red flags under the FinCEN law and guidance. The red flags in turn triggered a duty on the part of Regions/AmSouth to investigate and I determine whether it had further duties under the FinCEN laws, including the requirement that it file a SAR. The red flags included the following:

- Deposits of investor funds into the accounts of Mr Park and Park Capital were commingled with other investor funds and the funds of Mr. Park and Park Capital, who engaged in transactions with the funds that demonstrated that Mr. Park and Park Capital were treating the investors' funds as if the were their own funds.

- Funds in the accounts of Mr. Park and Park Capital that Regions/AmSouth knew to be funds received from investors were regularly used for the personal benefit of Mr. Park, Park Capital, and their business associates. It is pot customary, normal, or acceptable for investment brokers such as Mr. Park to pay personal and business expenses from investor funds, and Regions/AmSouth knew that.

6

- Mr. Park and Park Capital had recurring urgent withdrawals of investor funds from their accounts. In connection with those withdrawals, they demanded access to the deposited funds before the funds would be available in the usual and regular time after deposits of investor funds were :made. The urgency of those needed withdrawals, by purchases of cashier's checks and otherwise, was communicated through demands by or 00 behalf of Mr. Park and Park Capital that Regions/Amsouth make investors' funds available for withdrawal for the benefit of Park and Park Capital before the deposited funds would normally be available, and Regions/AmSouth complied with their requests not to put "holds" on such deposits.

30. On multiple occasions in the period prior to summer 2008, Mr. Park and Park Capital withdrew substantial sums from their business and personal accounts in the form of cashier's checks or cash in amounts which individually did not trigger the requirement for a Currency Transaction Report ($10,000), but taken together did require such a report. These transactions should have triggered Currency Transaction Reports, and should have been brought to the attention of responsible officers at Regions/AmSouth.

31. Mr. Park, personally or through his agents, regularly transferred money from one Regions/AmSouth bank account to another. These transfers took place by ACH, wire transfer, check, counter check, and telephone transfer. Many of these transfers took place to make up for overdrafts in the accounts. Such transfers, and the overdrafts that necessitated them, were not consistent with a legitimate business enterprise.

32. Mr. Park regularly used money received from investors and deposited in Regions/AmSouth accounts to pay business and operating expenses and for personal purposes. Regions/AmSouth knew or should have known that such conduct was improper.

33. Regions/AmSouth knew that Mr. Park was withdrawing large sums of money in transactions which individually did not require a Currency Transaction Report, but taken together, did reach such levels. Regions/AmSouth knew that Mr. Park regularly withdrew cash in amounts which indicated that he was structuring his transactions in an attempt to avoid the filing of a Currency Transaction Report.

34. Regions/AmSouth knew that Mr. Park was using cashier's checks and other transfers to withdraw substantial amounts of money from investor funds for his personal benefit.

7

35. Regions/AmSouth knew that Mr. Park was conducting a large number of transactions in even dollar amounts. Many of those transactions were for his personal benefit or the personal benefit of his associates. Many of the transfers appear to have been structured to avoid the currency transfer reporting laws.

36. Regions/AmSouth either knew that transactions in its accounts were not consistent with the legitimate business of Mr. Park and Park Capital or acted in reckless disregard of facts that would have given Regions/AmSouth that knowledge. Alternatively, Regions/AmSouth reasonably should have known that those transactions were not consistent with the legitimate business of Mr. Park and Park Capital. Regions/AmSouth also knew that transactions in the accounts of Mr. Park and Park Capital had no rational business purpose or acted in reckless disregard of facts that would have given Regions/AmSouth that knowledge. Alternatively, Regions/AmSouth reasonably should have known that the transactions had no rational business purpose.

37. Regions/AmSouth knew that the accounts of Mr. Park and Park Capital were sometimes overdrawn. It knew that there was a high volume of activity, but the collected funds and the average balances were often relatively low.

38. Regions/AmSouth knew or should have known that there was an unreasonably high volume of transfers and cashier's checks, in connection with sometimes over-drawn accounts.

39. Regions/AmSouth knew or should have known that there was a pattern of deposits of investor funds transfers followed by withdrawals or disbursements very shortly thereafter for purposes that were inconsistent with the proper use or investment of investor funds.

\* \* \*

42. Defendant had a duty to monitor the accounts of Mr. Park and Park Capital, including the accounts in which plaintiffs' assets were deposited at Regions/AmSouth, in accordance with the legal obligations set forth above and pursuant to the common law of Tennessee.

43. In violation of its duty of reasonable care, defendant failed to comply with federal law, failed to detect and report the unlawful conduct of Mr. Park and Park Capital, and allowed Mr. Park and Park Capital to mishandle plaintiffs' assets, use those assets in inappropriate ways, and transfer them to entities that had no right to plaintiffs' assets.

\* \* \*

46. In addition, because defendant with acted with severe recklessness and in willful and/or conscious disregard of its statutory and common law obligations and the rights of others, plaintiffs request an award of punitive damages in the amount of five times plaintiffs' actual damages.

(Docket Entry No. 8, First Amended Complaint at ¶¶ 7-12, 14-17, 20, 23, 25-26, 28-39, 42-43, 46).

## B. Conclusions of Law

To survive a motion to dismiss, Plaintiffs' complaint must include sufficient "factual allegations to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). To be sure, the complaint must be construed in the light most favorable to the plaintiff with well pled facts to be deemed true, and with all reasonable factual inferences in favor of the Plaintiffs. Jones v. City of Cincinnati, 521 F.3d 555, 559 (6th Cir. 2008). Plaintiffs' complaint must set forth directly or inferentially sufficient factual allegations for each element of their claims. Tam Travel, Inc. v. Delta Airlines, Inc., 583 F.3d 896, 903 (6th Cir. 2009). Legal conclusions or unwarranted factual inferences do not meet this standard. Id.

Under Tennessee law, "[a] negligence action requires evidence proving the following elements: (1) a duty owed by the defendant to the plaintiff; (2) defendant's breach of that duty; (3) injury; (4) causation in fact; and (5) proximate, or legal, cause." Naifeh v. Valley Forge Life Ins. Co., 204 S.W.3d 758, 771 (Tenn. 2006). Under Tennessee law, a duty is owed "to others to refrain from engaging in misfeasance, affirmative acts that a reasonable person should recognize as involving an unreasonable risk of causing an invasion of an interest of another or acts which involve an unreasonable risk of harm to another." Giggers v. Memphis House. Auth., 277 S.W.3d 359, 364 (Tenn. 2009) (quoting Restatement (Second) of Torts §§ 284, 302 (1965)). The

9

existence of a legal duty in a given factual context is a question of law for the Court. Id. at 365.

In Downs ex rel. Downs v. Bush, 263 S.W.3d 812, 820 (Tenn. 2008), the Tennessee Supreme Court held that the foreseeability of the harm is a key factor on whether a defendant owes a legal duty and that "a risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable. If there is a finding of a foreseeable risk of harm, "courts must engage in 'an analysis of the relevant public policy considerations,' to determine whether a duty enforceable in tort must be imposed." Giggers, 277 S.W.3d at 366 (citations omitted). The following non-exclusive factors have been considered:

> [T]he foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

Id. (citations omitted).

Although Tennessee courts are reluctant to impose liability for nonfeasance, "as a means of mitigating the harshness of the common law rule, exceptions have been created for circumstances in which the defendant has a special relationship with either the individual who is the source of the danger or the person who is at risk." Id. at 364. "[E]ven though the specific negligent act may constitute an omission, the entirety of the conduct may still be misfeasance that created a risk of harm." Satterfield v. Breeding Insulation Co., 266 S.W.3d 347, 356-57 (Tenn. 2008).

As this Court stated in As You Sow v. AIG Fin. Advisors, Inc., 584 F. Supp. 2d 1034,

10

1047 (M.D. Tenn. 2008), "a common law duty may be based on a statute even if the statute does not create an independent private right of action under the statute." (citing Draper v. Westerfield, 181 S.W.2d 283 (Tenn. 2005) (that relied upon statute to recognize common law duty for a physician who violated a statutory duty to report child abuse). Plaintiffs' common law negligence claims are premised upon state statutes, including Tenn. Code Ann. § 35-2-109 of Tennessee's Uniform Fiduciaries Act, that imposes liability upon the depository bank if the factual allegations reflect the bank's "actual knowledge" of a fiduciary's breach of his duties or if the bank has knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith." Id. Under Tenn. Code Ann. § 35-2-107, a bank is not liable for a fiduciary's handling of an account "unless the bank . . . . pays the check with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligations as a fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith."

Based upon their factual allegations, Plaintiffs assert that Defendant acted in bad faith in its payment of the Park checks from the fiduciary account, and under these factual circumstances, Tennessee law would impose liability for the Defendant's negligence. In Chambers v. First Trust & Savings Bank, 1992 Tenn. App. LEXIS 231, *7-8 (1992), the Tennessee Court of Appeals stated that a bank does not owe any duty to supervise a fiduciary's account "unless circumstances are such to put the bank on notice that the fiduciary is misappropriating or intends to misappropriate funds." Id. (emphasis added). "What is sufficient to put the bank on notice depends on the particular facts and circumstances of each case." Id.

In Lawyers Title Ins. Corp. v. United American Bank, 21 F. Supp. 2d 785, 797-98 (W.D. Tenn. 1998), the District Court held that a plaintiff had sufficiently stated negligence claims

11

against a bank that knowingly aided and abetted an attorney who was using client funds to pay personal debt. In Wolfe v. MBNA Am. Bank, 485 F. Supp. 2d 874 (W.D. Tenn. 2007), an identity theft victim stated viable negligence claims against a bank for issuing a credit card to an unknown individual in the victim's name as a foreseeable harm and therefore established the bank's duty to verify the authenticity of a credit card application.

In Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006), the Second Circuit reversed dismissal of a negligence action against three banks by non-customers who had been defrauded by a lawyer. The lawyer deposited clients' funds in his personal accounts without their knowledge or consent. Plaintiffs alleged that the banks had knowledge that the accounts were intended to hold clients funds in trust. The banks allegedly failed to report the lawyer's repeated overdrafts to the state bar as required by New York law. The Second Circuit concluded that the bank owed a duty to make reasonable inquiries and safeguard trust funds from the lawyer's misappropriation because trust funds trigger a "duty of inquiry" and a duty to "endeavor to prevent a diversion." Id. at 287-88. The Second Circuit then held that after the attorney repeatedly overdrew accounts containing those funds, the bank owed a duty to make reasonable inquiries and safeguard the trust fund from misappropriation. The bank's failure to do so "would qualify as a proximate cause of the clients' losses." Id. at 289-90. See also Wuliger v. Liberty Bank, N.A., 2004 U.S. Dist. LEXIS 27353 (N.D. Ohio, Mar. 4, 2004); Jairett v. First Montauk Sec. Corp., 153 F.Supp.2d 562 (E.D. Pa. 2001); and N.J. Title Ins. Co. v. Caputo, 748 F.2d 507, 514 (N.J. 2000).

Plaintiffs also allege that Defendant had a special relationship with Park Capital because under federal law: (1) Defendant had a duty to monitor Park Capital accounts to uncover improper activities; (2) Defendant knew that Park Capital's accounts contained funds held in trust for

12

clients; (3) the activities in Park Capital's accounts were highly suspicious; and (4) Defendant's awareness of the lack of account monitoring for suspicious activity that is required in compliance with federal law. Plaintiffs allege that a federal regulatory agency cited Defendant and its predecessors for violations of these obligations under federal law. Here, the Court concludes that Plaintiffs' amended complaint sufficiently alleges that the Defendant's agents' acts and omissions allowed Park and Park Capital to obtain funds from Plaintiffs' accounts, even though the Defendant's agents knew these monies belonged to Park Capital's clients.

Defendant next contends that Tennessee law prohibits negligence claims for the Plaintiffs' "economic loss" because of Plaintiffs lack of privity with the Defendant. "The economic loss rule is a judicially created principle that requires parties to live by their contracts rather than to pursue tort actions for purely economic losses arising out of the contract." McLean v. Bourget's Bike Works, Inc., 2005 Tenn. App. LEXIS 645, *7 (Tenn. Ct. App. 2005).[1] Here, Plaintiffs' loss was a direct economic loss, not an "indirect" economic loss to which the economic loss doctrine applies as in products liability actions. See John Martin Co. v. Morse/Diesel, Inc., 819 S.W.2d 428 (1991). Under Tennessee law, the economic loss doctrine does not apply to a negligent supervision claim. Acuity v. McGhee Eng'g, Inc., 2008 Tenn. App. LEXIS 799, at *37 (Tenn.

---

[1] See also Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995) (the doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.") Giles v. GMAC, 494 F.3D 865, 873 (9th Cir. 2007) ("doctrine is designed to maintain a distinction between damage remedies for breach of contract and for tort . . . . [it] provides that certain economic losses are properly remediable only in contract"). Other courts have applied the doctrine in non-privity cases involving unforeseeable losses. See also Aikens v. Baltimore & Ohio RR. Co., 348 Pa. Super. 17, 501 A.2d 277, 279 (Pa. Super. 1985) ("The reason that the plaintiff cannot recover stems from the fact that the negligent actor has no knowledge of the contract or prospective relation and thus has not reason to foresee any harm to the plaintiff's interest.") (appendix 12). These factors are of no relevance

13

Ct. App. Dec. 15, 2008) ("despite the absence of privity, a plaintiff may maintain an action for purely economic loss based upon negligent supervision or negligent misrepresentation."). Thus, the Court concludes that Plaintiffs' amended complaint states valid claims for negligence.

Defendant next argues that the Tennessee Consumer Protection Act ("TCPA") claim fails for Plaintiffs' lack of a contractual relationship with Defendant. The TCPA states:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1).

For a TCPA claim, Plaintiffs must allege: "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA; and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or things of value wherever situated." Tucker v. Sierra Builders, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). The Tennessee Supreme Court emphasized that each TCPA claim "must be examined on its own facts." Hathaway v. First Family Fin. Servs., 1 S.W.3d 634, 642-43 (Tenn. 1999).

The TCPA does not require a contractual relationship. See Healtherly v. Merrimack Mut. Fire Ins. Co., 43 S.W.3d 911, 915 (Tenn. Ct. App. 2000) ("privity of contract is not required for consumer protection act claims"); Cloud Nine, LLC v. Whaley, 2009 U.S. Dist. LEXIS 53464, *20 (E.D. Tenn. June 19, 2009) (rejecting lack of privity defense because the provisions of TCPA "do not require that the deceptive act or practice be directed toward the plaintiff. Instead, in the present case.

Tennessee courts have recognized that plaintiffs asserting claims under the TCPA are required to show that the defendant's wrongful conduct proximately caused their injury"). In Healtherly, the plaintiffs' insuror hired a third party to evaluate plaintiffs' insurance claims. Plaintiffs sued the third party for unfair and deceptive trade practices that allegedly damaged plaintiffs and such claims were deemed actionable. 43 S.W.3d at 915.

Here, Park Capital, with whom Plaintiffs had a contractual relationship, hired a third party, Defendant, to facilitate Park Capital's rendering of services and management of Plaintiffs' funds. Plaintiffs assert quantifiable losses due to the Defendant's unfair trade practices[2] in servicing Plaintiffs funds in accounts set up by Park with the Defendant as well as the Defendant's failure to abide by federal law that requires such monitoring of these funds.

Investment services fall within the TCPA, Johnson v. John Hancock Funds, 217 S.W.3d 414, 428-29 (Tenn. Ct. App. 2006) (TCPA applies to securities transactions) as do some banking activities. Pursell v. First Am. Nat'l Bank, 937 S.W.2d 838, 842 (Tenn. 1996); Wolfe v. MBNA Am Bank, 485 F.Supp.2d 874 (W.D. Tenn. 2007). In Pursell, while a bank's actions after repossession of loan collateral did not affect trade or commerce under the TCPA, the court there declined to find any general exemption for banking activities under the TCPA. Id. at 842.

A defendant's unfair acts need not induce a consumer transaction. See Gaston v. Tennessee Farmers Mut. Ins. Co., 120 S.W.3d 821-22 (Tenn. 2003) (the provisions of the TCPA may apply to insurance companies in the handling of claims by policyholders); Keith v. Howerton, 2001 Tenn. App. LEXIS 646 (Tenn. Ct. App. Aug. 28, 2001) (pawnbroker violated TCPA by

---

[2]Tenn. Code Ann. § 47-18-103 defines "trade," or "consumer transaction" as the offering or distribution of any goods or services. Obviously, Defendant was providing services to Park Capital at the time of the events giving rise to Plaintiffs' claims.

15

failing to reimburse customer for value of his property, which was stolen from pawn shop). Tennessee courts have held that a firm's unfair conduct after a consumer has purchased goods or services, may violate the TCPA. For example, in Nzirubusa v. United Imports, Inc., 2006 Tenn. App. LEXIS 413 (Tenn. Ct. App. June 21, 2006) a used car dealer violated the TCPA by refusing, after the buyer paid for a vehicle, to give the buyer clear title unless she paid additional money. The Tennessee Court of Appeals noted that the TCPA "covers not only acts leading to the initial agreement to engage in a consumer transaction, but also the distribution of the property or other things of value that were the subject of that transaction." Id. at 11.

Here, Defendant and its predecessors' agents allegedly were reckless in allowing Park Capital to steal monies that Defendant knew had been invested for the benefit of Park Capital's clients. Defendant's acts and omission affected the conduct of trade or commerce in investment services, i.e., Park Capital's abuse in its investment services and Plaintiffs' attempt to utilize those services. Thus, the Court concludes that Plaintiffs' amended complaint states valid TCPA claims.

For Plaintiffs' unjust enrichment claims, "liability can be created where one person receives a benefit at the expense of another and it is unjust or inequitable for him to retain this benefit." Jaffe v. Bolton, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991). The doctrine applies to a defendant that receives a benefit that is unjust for him to retain. Browder v. Hite, 602 S.W. 489, 491 (Tenn. App. 1980). Contractual dealings with a defendant are unnecessary to state a claim for unjust enrichment. Freeman Industries v. Eastman Chemical Co., 172 S.W.3d 512, 525 (Tenn. 2005); Paschall's Inc. v. Dozier, 407 S.W.2d 150, 154 (Tenn. 1966). In such instances, the duty to make restitution applies regardless of the intent of the person benefited. Browder v.

Case 3:09-cv-00908   Document 31   Filed 08/04/10   Page 16 of 18 PageID #: 994

Hite, 602 S.W.3d 489, 492 (Tenn. Ct. App. 1980).

Here, Plaintiffs allege that Defendant earned substantial account fees that were assessed against the Park Capital accounts and funds entrusted by Plaintiffs and other clients to Park Capital. Plaintiffs' allege benefits from Plaintiffs' funds were obtained through Park Capital's illegal withdrawals from accounts that Defendant managed. Freeman Industries v. Eastman Chemical Co., 172 S.W.3d 512 (Tenn. 2005) (receipt of an indirect benefit sufficient for unjust enrichment claim); see also First National of North America, LLC v. Marks, 2004 Tenn. App. Lexis 325 (Tenn. App., May 18, 2004), appeal denied Nov. 15, 2004 (appendix 23) (unjust enrichment award allowed despite facts that the funds went from plaintiff to defendant via a third-party and the transactions between the plaintiff and the defrauding party were separate from the transactions between defendant and the defrauding party).

In Freeman Industries, the Tennessee Supreme Court cited with approval Hirsch v. Bank of America, 107 Cal. App. 4th 708, 132 Cal. Rptr. 2d 220, 229 (Cal. Ct. App. 2003), where the court ruled that a bank that charged excessive fees to a title company was potentially liable for unjust enrichment in an action by title company customers whose money was used to pay the excessive fees. This factual scenario is materially indistinguishable from the alleged facts here.

Plaintiffs need not trace precisely the flow of every dollar from themselves to Defendant. See Fidelity National Ins. Co. v. Intercounty National Title Ins. Co., 2004 U.S. Dist. Lexis 7349, at *16 (N.D. Ill. 2004). In Fidelity National, the district court rejected defendants' argument that the plaintiff had to "trace every dollar owed," noting that that conclusion is particularly true in a case in which "funds were deposited into a common escrow account and taken out later." Id. In the appeal in Fidelity, the Seventh Circuit ruled that even if the defendant were not a party to

17

fraud, the defendant could be held liable under the doctrine of unjust enrichment, if the defendant received the proceeds of fraud. Fidelity National Title Ins. Co. v. Intercounty National Title Ins. Co., 412 F.3d 745, 748 (7th Cir. 2005).

Finally, the Defendant argues Plaintiffs failed to exhaust their remedies against Park, but a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity, if the pursuit of the remedies would be futile. Here, Park faces a prison sentence and is in bankruptcy. Plaintiffs may recoup a small part of their investments in the Park bankruptcy, but the jury can determine the extent to which those circumstances should affect the unjust enrichment award.

For these reasons, the Court concludes that the Defendant's motion to dismiss (Docket Entry No. 10) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _4th_ day of ~~July~~ August, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

18